**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ROBERT A. GARNER, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 13-2756 |
| | : | |
| THE SCHOOL DISTRICT OF PHILADELPHIA, | : | |
| | : | |
| Defendant. | : | |
| | : | |

**MEMORANDUM**

**ROBERT F. KELLY, Sr. J.**                                **OCTOBER 24, 2014**

Presently before the Court is Defendant, the School District of Philadelphia's (the "School District"), Motion for Summary Judgment against Plaintiff, Robert A. Garner ("Garner"), Garner's Response, and the School District's Reply thereto. For the reasons stated below, the Motion is granted.

I.      **BACKGROUND**

Garner has been employed by the School District since 1990. Compl. ¶ 12. Garner asserts that he started working for the School District as a Security Officer in or around 1990, and became a School Police Officer[1] in or around 2000 or 2001. Id. Garner states that about four years later, he was promoted to Sergeant, and was then assigned to an "Acting Lieutenant" position for three years. (Pl.'s Resp. at 7-8.) He was later reassigned back to Sergeant. (Id.) In

---

[1] School District police officers are ten-month employees. (Def.'s Mot. Summ. J., Ex. D-1.) They work and are paid for ten months of the school year from September 1 to the following June 30, and are off and not paid during July and August. (Id.) As a School District employee, Garner is a member of a collective bargaining unit known as the Commonwealth Association of School Administrators ("CASA"), which is represented by Teamsters Local Union 502 ("Local 502"). (Id.) Robert McGrogan was Local 502's President during all relevant times. (Id., McGrogan Dep. at 6-8 ("McGrogan Dep.").)

November 2010, Garner suffered a work-related injury and began a workers' compensation leave

of absence.  (Def.'s Mot. Summ. J., Garner Dep. at 36 ("Garner Dep.").)  He was cleared to

return to work by no later than May 3, 2011.  (Id., Ex. D-26.)  Garner did not return to work at

that time but, instead, notified the School District that he needed a medical leave of absence for a

serious medical condition that rendered him unable to do his job.[2]  (Id., Ex. D-27.)   Since that

time up until the present, Garner has not worked because of medical problems he alleges prevent

him from performing his job.  See Compl.

Garner filed a Complaint in this action on May 20, 2013.  He asserts that he is a disabled

person as defined by the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101

et seq.,[3] and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951 et seq.,[4] and is

---

[2]It is important to note, at this time, what benefits Garner was and is entitled to as an employee of the School District.  He receives ten fully paid sick days ("Paid Sick Days") each year, which can be banked for future use.  (Def.'s Mot. Summ. J., Ex. D-2.)  An employee who is or will be absent for more than ten consecutive days must be approved for a medical leave of absence.  (Id.)  Such an employee is required to report to the School District's office of Employee Health Service ("EHS"), and provide medical documentation of the employee's inability to work.  (Id.)  The School District employs a physician as EHS's Medical Director, who is responsible for evaluating the employee and his medical information.  (Id.)  In this case, Aribelle Jones, M.D. ("Dr. Jones") has served in this position at all relevant times.  Garner was also entitled to participate in a benefit program known as "Wage Continuation," which provides benefits of 75% of regular wages up to one year, and is only available after exhaustion of Paid Sick Days.  (Id.)  In addition, after ten years of service, Garner became eligible for "Health Restoration Sabbatical," which is only available after exhaustion of Paid Sick Days and Wage Continuation, and pays 50% of employee's wages.  (Id.)

If EHS does not approve a medical leave, the employee must return to work.  If he fails to do so, the employee is considered to be taking unauthorized leave and cannot use Paid Sick Days or Wage Continuation, and is subject to discipline.  (Id.)  If EHS approves a medical leave, the employee can use his benefits, as available, and is immediately scheduled for a follow-up appointment with EHS.  (Id.)  This process continues until the employee either exhausts his benefits or is cleared to return to work.  (Id.)  If the employee disagrees with EHS, he may request a third-party examination ("TPE").  (Id.)

[3]The ADA reads, in pertinent part, as follows:

No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job

2

"capable of performing the essential functions of his position with reasonable accommodation" from the School District.  Id. ¶ 15.  He states that he suffers from "follicular lymphoma with GI symptoms; bloating, severe physical abdominal pains, inability to stand for a long period of time and constant bowel movements."  Id. ¶ 13.  Garner contends that the School District:

> [f]ailed to provide Plaintiff with reasonable accommodation for his disability, failed to engage Plaintiff in a good faith interactive process as required under the statutes in order to address Plaintiff's needs for accommodation, but subjected Plaintiff to denial of the use of his earned sick leave benefits, denial of continuation of wage benefits, because of his disability, and when Plaintiff continued to seek protection under the ADA and PHRA because of his disabilities and complained about Defendant [sic] failure to grant him reasonable accommodation as provided under these federal and state statutes, Defendant retaliated against Plaintiff by subjecting him to unwarranted discipline, subjected him to unpaid leave of absence and then terminating his employment because he continued to assert his rights for reasonable accommodation under these statutes because of his disability.

Id. ¶ 16.

The School Board filed the instant Motion for Summary Judgment on June 13, 2014. Garner filed a Response, and the School Board filed a Reply thereto.

---

application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112.

[4]Courts within the Third Circuit treat PHRA claims as coextensive with claims brought under the ADA.  Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996); Gomez v. Allegheny Health Servs., Inc., 71 F.3d 1079, 1083-84 (3d Cir. 1995).  As such, it is appropriate to analyze these two claims together under the same standard.  See Kelly, 94 F.3d at 105.

## II.     STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) states that summary judgment is proper "if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  See Hines v. Consol. Rail Corp., 926 F.2d 262, 267 (3d Cir. 1991).  The Court asks "whether the evidence presents a sufficient disagreement to require submission to the jury or whether . . . one party must prevail as a matter of law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).  The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "A fact is material if it could affect the outcome of the suit after applying the substantive law.  Further, a dispute over a material fact must be 'genuine,' i.e., the evidence must be such 'that a reasonable jury could return a verdict in favor of the non-moving party.'"  Compton v. Nat'l League of Prof'l Baseball Clubs, 995 F. Supp. 554, 561 n.14 (E.D. Pa. 1998).

Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.  Once the moving party has produced evidence in support of summary judgment, the non-moving party must go beyond the allegations set forth in its pleadings and counter with evidence that presents "specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); see Big Apple BMW, Inc. v. BMW of N. Am. Inc., 974 F.2d 1358, 1362-63 (3d Cir. 1992).  "More than a mere scintilla of evidence in its favor" must be presented by the non-moving party in order to overcome a summary judgment motion.  Tziatzios v. United States, 164 F.R.D. 410, 411-12 (E.D. Pa. 1996).

4

If the court determines that there are no genuine issues of material fact, then summary judgment

will be granted.  Celotex, 477 U.S. at 322.

## III.   DISCUSSION

### A.  The ADA

The ADA prohibits employers from discriminating "against a qualified individual on the

basis of disability in regard to job application procedures, the hiring, advancement, or discharge

of employees, employee compensation, job training, and other terms, conditions, and privileges

of employment."  42 U.S.C. § 12112(a); see also Gaul v. Lucent Techs. Inc., 134 F.3d 576, 579

(3d Cir. 1998).  A "qualified individual" with a disability[5] is a person who, "with or without

reasonable accommodation, can perform the essential functions of the employment position that

such individual holds or desires."  42 U.S.C. § 12111(8).  A reasonable accommodation claim

requires a plaintiff to show that his employer failed to make "reasonable accommodations to the

known physical or mental limitations of an otherwise qualified individual with a disability who is

an . . . employee, unless the [employer] can demonstrate that the accommodation would impose

an undue hardship on the operation of the business of [the employer]."  42 U.S.C.

§ 12112(b)(5)(A); see also Solomon v. Sch. Dist. of Phila., 532 F. App'x 154, 157 (3d Cir. 2013).

A plaintiff presents a prima facie case of discrimination under the ADA by demonstrating

that: (1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to

perform the essential functions of the job, with or without reasonable accommodations by the

---

[5]A "disability" is defined as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual, (B) a record of such impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(2); see also Sulima v. Tobyhanna Army Depot, 602 F.3d 177, 185 (3d Cir. 2010).

employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination.  Gaul, 134 F.3d at 579-80; Shiring v. Runyon, 90 F.3d 827, 831 (3d Cir. 1996).

### 1. Otherwise Qualified

In this case, the parties do not dispute whether Garner is "disabled" within the meaning of the ADA.  One of their disagreements relates to the second element of a plaintiff's prima facie case.  The School District asserts that Garner cannot establish a prima facie case of discrimination under the ADA because he is not "otherwise qualified" to perform the essential functions of his job with or without reasonable accommodations.  See Gaul, 134 F.3d at 579-80. The School District argues that Garner's own deposition testimony and the evidence of record establishes that he is completely unable to work with or without reasonable accommodation and, therefore, he is not a "qualified" individual with a disability.  (Def.'s Mot. Summ. J. at 29.)   We agree.

The Equal Employment Opportunity Commission ("EEOC") Regulations preface the inquiry of whether an individual is "qualified" with two threshold questions: (1) whether the individual has the requisite skill, experience, education and other job-related requirements of the position; and (2) whether the individual, with or without reasonable accommodation, can perform the essential functions of that position.  29 C.F.R. § 1630.2(n); see also Buskirk v. Apollo Metals, 307 F.3d 160, 168 (3d Cir. 2002).  The determination of whether an individual can, with or without reasonable accommodation, perform the essential functions of the position is a two-step process as well.  Deane v. Pocono Medical Center, 142 F.3d 138, 146 (3d Cir. 1998).  As the Court in Deane explained:

> [f]irst, a court must consider whether an individual can perform the

> essential functions of the job without accommodation.  If so, the
> individual is qualified and, is not entitled to accommodation.  If
> not, then a court must look to whether the individual can perform
> the essential functions of the job with a reasonable
> accommodation.  If so, the individual is qualified. If not, the
> individual has failed to set out a necessary element of the prima
> facie case.

Id.

If a plaintiff claims that he could not do his job with or without reasonable

accommodation at the time of his adverse employment determination, he cannot make out a

prima facie case of discrimination under the ADA.  See Barclay v. Amtrak, 435 F. Supp. 2d 438,

445 (E.D. Pa. 2006).  Here, Garner has consistently asserted, during the more than three years

that he has been out of work,[6] that he was and is unable to do his job with any accommodation,

and his testimony supports such.[7]

Garner testified at his deposition that he completed an ADA Intake Questionnaire with

the help of his doctor.  (Garner Dep. at 24.)  He acknowledged that he wrote in the Questionnaire

that "[m]y disability makes it difficult for me to be away from home for more than a few hours,

and almost impossible most morning hours."  (Id.)  Garner added that this was true at all times

from October 15, 2012, through the date of his deposition on May 23, 2014.  (Id.)  Garner was

later asked, "[i]s it still the case that you are unable to participate or assume your work

_____

[6]It is undisputed that Garner has been out of work from May, 2011, through the present, other
than a few days that he worked in January 2012.  Almost immediately after returning to work in early
January, 2011, Garner began calling out sick and stopped working altogether.  He then requested another
medical leave from the School District.

[7]The record indicates that September 3, 2013, was the first time that Garner requested
"accommodations for my disabilities under the [ADA] and [PHRA] to use my sick leave and
continuation of salary benefits to address my disability."  (Def.'s Mot. Summ. J., Ex. D-48.)  However, as
will be discussed, infra, the unlimited and indefinite use of leave is not a reasonable accommodation
under the ADA.

activities?" (Id. at 124.)  He responded, "[y]es, sir."  (Id.)

Garner was further asked at his deposition:

> Q.  Mr. Garner, are you currently able to work at the school district?
>
> A.  No.
>
> Q.  Why are you not able to work currently?
>
> A.  Because of my symptoms, my stomach.  I have headaches.  My heart, blood pressure.

(Id. at 17-18.)

The record also supports the determination that Garner never believed that he was able to return to his job with or without a reasonable accommodation.  At a December 12, 2011 appointment with EHS, Garner submitted a note from Physician Assistant ("PA") Carly Smith of Hillmont GI which stated that Garner "may return to work."[8]  (Def.'s Mot. Summ. J., Ex. D-4.) However, despite the opinion of his GI specialist, he did not return to work.[9]  (Id.)  Further, on November 26, 2013, Garner submitted to EMS a note from Dr. Stavropoula Tjoumakaris ("Dr. Tjoumakaris") of Jefferson's Department of Neurological Surgery which stated that Garner could "return to work as of 1/6/14."  (Id., Ex. D-51.)   In addition, Dr. Diana Tzeng ("Dr. Tzeng") of Jefferson University Hospital's Stroke Center opined on January 9, 2014, that "I think that

---

[8]The entire history of Garner's medical leave requests from the School District during the time he was out of work, along with the relevant medical documentation he submitted, will be set forth and discussed later in this Memorandum Opinion.

[9]It is noted that Garner did not return to Hillmont GI after they wrote this note clearing him to return to work.

8

returning back to work on a part-time basis with limited responsibilities might actually help [Garner] in terms of regaining some of his cognitive acuity." (Id., Ex. D-52.)  (Id.)  Garner, however, did not and does not believe that he could ever return to work because of ongoing GI issues.  Garner testified at this deposition:

> Q.   Are you still prohibited from even part-time work from your GI issues?
>
> A.  Yes, sir.
>
> *        *        *
>
> Q.  What my question is, is given the fact that your unresolved GI issues still prevent you from returning to work, is it fair to say that Dr. Tzeng's recommendation about returning to work part time really is not a meaningful recommendation, because you can't return not because of the head but because of the GI issues?
>
> A.  Yes, sir.

(Garner Dep at 156-57.)

Moreover, Robert McGrogan ("McGrogan"), President of Local 502, who actively advocated on Garner's behalf with the School District concerning Garner's medical leaves, was told by Garner that he could not return to work.  McGrogan was also of the opinion that the School District did not discriminate against Garner because of his disability.  He testified at his deposition:

> Q.  Okay.  When was the last time you spoke with Mr. Garner regarding his health status in terms of his ability to return to work to the school district?
>
> A.  The last visit I account [sic] was in August or September [2013].

\*      \*      \*

Q.  Did Mr. Garner tell you what his ability to return to work was when you spoke with him in August?

A.  Yes.

Q.  What did he tell you?

A.  That he wasn't able to return to work.

\*      \*      \*

Q.  As president of CASA, Mr. McGrogan, did you ever come to a conclusion that the district was discriminating against Mr. Garner based on his status as having a disability?

\*      \*      \*

A.  No.

Q.  Did you ever have discussions with Mr. Garner regarding any issues touching on the Americans with Disabilities Act?

A.  No.

(Id. at 53-57.)

Because the testimony and medical evidence of record establishes that Garner believed that he was never able to return to work with the School District with or without a reasonable accommodation, he is not a "qualified" individual with a disability as contemplated by the ADA. See  Deily v. Waste Management of Allentown, 55 F. App'x 605, 607 (3d Cir. 2003).  Thus, he

10

has failed to present a prima facie case of discrimination under the ADA.  Although summary judgment can be granted on this basis alone, we will address Garner's other ADA arguments as well.

### 2. Reasonable Accommodation[10]

Next, Garner maintains that the School District unlawfully refused his request for accommodation to use his Paid Sick Days and Wage Continuation benefits for his disability between November 7, 2011, and December 5, 2011, and between March 12, 2012, and June 5,

---

[10]The ADA regulations describe the term "reasonable accommodation" as:

(i) Modifications or adjustments to a job application process that enable a qualified applicant with a disability to be considered for the position such qualified applicant desires; or

(ii) Modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position; or

(iii) Modifications or adjustments that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities.

29 C.F.R. § 1630.2(o).  The regulations go on to state that reasonable accommodations may include:

(i) Making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

(ii) Job restructuring; part-time or modified work schedules; reassignment to a vacant position; acquisition or modifications of equipment or devices; appropriate adjustment or modifications of examinations, training materials, or policies; the provision of qualified readers or interpreters; and other similar accommodations for individuals with disabilities.

Id.

11

2012, despite the fact that his treating physicians provided the School District with medical records and certifications of his disabilities.  (Pl.'s Resp. at 3.)  The School District asserts that it "does not dispute that leave, either unpaid or paid, may be considered a reasonable accommodation of an employee's disability under certain circumstances."  See Walton v. Mental Health Ass'n of Southeastern Pa., 168 F.3d 661, 671 (3d Cir. 1999).  It, however, does argue that Garner's request for "indefinite" medical leave is not a reasonable accommodation under the ADA.  We agree.

In some circumstances, a leave of absence for medical treatment can be considered as a reasonable accommodation for a plaintiff's disability.  Dogmanits v. Capital Blue Cross, 413 F. Supp. 2d 452, 460-61 (E.D. Pa. 2005); see also Shannon v. City of Phila., No. 98-5277, 1999 WL 1065210, at *5-6 (E.D. Pa. Nov. 23, 1999).  However, leave time must enable the employee to perform his or her essential job functions in the near future.  Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 151 (3d Cir. 2004).  The weight of authority in the Court of Appeals for the Third Circuit ("Third Circuit"), as well as other Circuits, clearly establishes that a leave of absence for an indefinite duration is not a reasonable accommodation.  See e.g., Fogleman v. Greater Hazleton Health Alliance, 122 F. App'x 581, 585 (3d Cir. 2004) (holding that an indefinite or open-ended leave "does not constitute a reasonable accommodation"); Peter v. Lincoln Technical Inst., 255 F. Supp. 2d 417, 437 (E.D. Pa. 2002) (citing to the Fourth, Fifth, Sixth, and Tenth Circuits in concluding that "an indefinite leave is inherently unreasonable").

Here, as will be discussed in more detail, infra, Garner repeatedly went to the School District and only requested indefinite medical leave for his disability during the entire time he

was out of work.[11]   As we have previously discussed, Garner was, and still is, of the opinion that

he is totally disabled from performing his job.  As established by his own testimony, Garner

never believed that he could return to work at a date in the near future.  He also never asked the

School District for anything other than indefinite medical leave periods.  In fact, the record is

devoid of Garner ever informing the School District that he could return to work at any future

date.

Moreover, the record demonstrates that Garner essentially requested indefinite medical

leave to utilize his remaining Paid Sick Days and Wage Continuation, not in anticipation that he

could return to work in a reasonable future date, but simply to exhaust his remaining sick days

without the requisite medical evidence required by the School District.  In addition, Garner is

under the mistaken impression that the ADA required the School District to approve his requests

for indefinite medical leave as a reasonable accommodation for his disability.  He, however, has

offered no case law in support of such an assumption; nor, have we found any.  Furthermore,

there is no evidence of record that the results of any forthcoming medical evaluation would be

certain or predictable as to when Garner could return to work.  Under these circumstances, we are

of the opinion that no reasonable jury could find that Garner would have been able to perform his

essential job functions in the near future.  Accordingly we find that Garner's request for

indefinite medical leave in order to use his benefits as a School District employee was not a

---

[11]We note that Garner acknowledges in his Response that requesting to use his medical leave
benefits for his disability is the only accommodation he ever requested from the School District.  (Pl.'s
Resp. at 10-11.)  We also note that Garner did not request this accommodation until September 3, 2013.
(Def.'s Mot. Summ. J., Ex. D-48.)  Moreover, as mentioned earlier, Garner's own Union President,
McGrogan, who advocated for him with the School District, testified that he never discussed the ADA
with Garner.  (McGrogan Dep. at 57.)

reasonable accommodation under the ADA.

### 3.  The Interactive Process

Garner also asserts that when he advised the School District of his disability and the need for accommodation between October 2011 and June 2012, it failed to engage in the ADA mandated good faith interactive process with him, denied him the ability to use his Paid Sick Days, and arbitrarily subjected him to adverse employment actions.  (Pl.'s Resp. at 8.)

The EEOC Guidelines provide that:

> Once a qualified individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation[,] . . . [which] is best determined through a flexible, interactive process that involves both the employer and employee with a disability.

Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 311 (3d Cir. 1999) (quoting 29 C.F.R. Pt. 1630, App § 1630.9 at 359).  The Third Circuit breaks the interactive process down into two steps: (1) providing adequate notice to the employer, followed by (2) interactive communication between the employer and employee.  Id. at 312-13.

In regard to the first step, the employee must provide the employer with reasonable notice of his request for an accommodation.  Id.  "[W]hile the notice does not have to be in writing, be made by the employee, or formally invoke the magic words 'reasonable accommodation,' the notice nonetheless must make clear that the employee wants assistance for . . . her disability."  Id. at 313; see also Fleck v. Wilmac Corp., No. 10-5562, 2012 WL 1033472, at *9 (E.D. Pa. Mar. 27, 2012).

The second step requires the Court to consider the employer and employee's respective

14

duties once the interactive process comes into play.  Id. at 317.  The Third Circuit has recognized that the ADA envisions the interactive process as the means by which a disabled employee and his employer share information to devise a potential accommodation.  Id.  Once an employee notifies his employer of his need for an accommodation for his disability, the employer must communicate with the employee and solicit whatever information is necessary to devise a suitable accommodation.  Id.  The interactive process requires participation from both parties because "each party holds information the other does not have or cannot easily obtain."  Id. at 316.

Neither the ADA, nor the implementing regulations, mandate a particular method for gathering information.  The law simply requires that the employer solicits information from the employee that will help the employer understand the employee's limitations, regardless of the form of this information-gathering process.  Id. at 315.  Moreover, the EEOC Guidelines require the employer to make a "reasonable effort to determine [ ] appropriate accommodation."  Id. at 316 (quoting 29 C.F.R. Pt. 1630, App. § 1630.9).  Employers can do so in several ways, including: meeting with the employee, requesting more information about the employee's conditions and limitations, offering to discuss available alternatives, or, at a minimum, showing at least "some sign of having considered the employee's request."  Id. at 317.

"An employee can demonstrate that an employer breached its duty to provide reasonable accommodations because it failed to engage in good faith in the interactive process by showing that: 1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been

reasonably accommodated but for the employer's lack of good faith." Williams v. Phila. Hous. Auth. Police Dept., 380 F.3d 751, 771 (3d Cir. 2004) (quoting Taylor, 184 F.3d at 317); see also Whelan v. Teledyne Metalworking Products, 226 F. App'x 141, 147 (3d Cir. 2007).

We first note there is no question that the School District knew of Garner's disability. Garner has always been clear to the School District that he has a GI condition which prevents him from doing his job.  Regarding the second step, as discussed above, Garner's admits that his sole proposed accommodation to the School District for his disability was for him to be permitted to take paid leave in various forms for an indefinite duration, which we have determined is not a reasonable accommodation under the ADA.  We note that "failure to participate in the interactive process is not a ground for liability unless the employee has proven a failure to accommodate, namely, that a reasonable accommodation existed and the employer unreasonably failed to provide it."  Deily, 55 F. App'x at 607.

However, even if Garner's request for indefinite leave was a reasonable accommodation, it is clear from the record that the School District actively engaged in a good faith interactive process with Garner in regard to his disability.  In fact, we are of the opinion that, not only did the School District take part in an interactive process with Garner concerning his disability and requests for medical leave, but conducted an intense interactive process with him by meeting with him on almost a monthly basis, and considering the medical information submitted to it. The record indicates that, on many occasions, the School District granted Garner medical leave and allowed him to use his benefits when Garner presented no medical evidence to support his contention that he was unable to perform his job.   Because Garner has apportioned a large part of his Response arguing that the School District failed to engage in an interactive process with

16

him in denying him a reasonable accommodation for his disability, we feel compelled to summarize below the School District's interaction with Garner since he first requested medical leave in May 2011.  We also summarize the medical evidence that Garner submitted to EHS in support of his requests for medical leave:

    1.  As noted above, Garner suffered a work-related injury in November 2010, and began a workers' compensation leave of absence.  (Garner Dep. at 36.)  Garner was cleared to return to work on May 3, 2011.  (Def.'s Mot. Summ. J., Ex. D-26.)  However, he did not return to work, but rather, requested a medical leave of absence on this date.  (Garner Dep. at 46.)  Garner met with the EHS on May 16, 2011, and the School District approved the leave and allowed him to use his bank of Paid Sick Days.  (Id.)  Plaintiff submitted to EHS a medical report from Dr. Paul Weisberg dated January 6, 2011.  (Def.'s Mot. Summ. J., Ex. P-1.)  Dr. Weisberg diagnosed Garner with irritable bowel syndrome, but noted that he declined any "pharmaceutical or other intervention."  (Id.)  Dr. Weisberg also reported that Garner had enlarged lymph nodes and ordered a CT scan.  (Id.)  Dr. Weisberg did not report that Garner was unable to work, or suggest a return-to-work date.  (Id.)  Garner also submitted a note from Dr. Sally Lane dated May 3, 2001, and a note from Dr. Linda Greenbaum ("Dr. Greenbaum") dated May 13, 2011.  (Id., Exs. P-37, P-40.)  Dr. Lane simply stated that Garner was under her care for enlarged lymph nodes and that his next appointment was in September 2011.  (Id., Ex. P-37.)  Dr. Greenbaum stated that Garner is "undergoing evaluation," and has been symptomatic for at least a month."  (Id., P-40.)  Despite the fact that none of these reports indicated that Garner was unable to work, the School District approved his medical leave.  (Garner Dep. at 46-47);

    2.  The School District Board met with Garner again on June 27, 2011.  Garner submitted a report dated June 23, 2011, from Dr. Atrayee Basu Mallick ("Dr. Mallick") from Jefferson University's Oncology Department.  (Def.'s Mot. Summ. J., Ex. D-30.)  Dr. Mallick indicated that Garner continued to have GI symptoms and was found to have "retroperitoneal lymphadenopathy," and he opined that further evaluation of this condition was needed.  (Id.)  Dr. Mallick offered no opinion as to Garner's ability to work or when he could return to work.  (Id.)  Despite this, the School District approved Garner's request to remain on paid medical leave until the new school year began.  (Id., Ex. D-31);

3.  Garner met with EHS on September 12, 2011.  At this meeting, he submitted a note from a PA, Melanie Santiago, which stated that Garner has "uncontrolled hypertension and [Garner] states that he is unable to work until he address [sic] this chronic condition."[12] (Id., Ex. 32.) Despite no evidence that Garner was unable to work, the School District approved his medical leave until his next follow-up with EHS on October 3, 2011.  (Id., Ex. D-33);

4.  On October 3, 2011, Garner submitted a note from Dr. Greenbaum which is handwritten and difficult to read, but appears to state that Garner's GI symptoms have not improved.  (Id., Ex. D-34.)  Dr. Greenbaum did not state that Garner was unable to work.  (Id.)  Moreover, Garner acknowledged that during the period covering October and November 2011, Dr. Greenbaum never advised him that he was unable to work.  (Garner Dep. at 77-78.)  Based on this lack of medical evidence, EHS (Dr. Jones) cleared Garner to return to work on November 7, 2011. (Def.'s Mot. Summ. J., Ex. P-41.)  Thus, the School District approved an additional month of medical leave for Garner during which he was permitted to use his Paid Sick Days without any evidence that he was unable to work during this time.  On October 12, 2011, McGrogan, acting on Garner's behalf, emailed Carol Kenney, Director of EHS, to request a TPE for Garner.  (Id., Ex. P-42.)  Kenney responded that the request was denied "because there is no difference of opinion stated in the report that you submitted at the exam on 10/3/11."  (Id., Ex. P-43.)  On October 17, 2011, McGrogan requested that EHS reconsider its position and submitted a new report from Dr. Greenbaum dated October 13, 2011.  (Id., Ex. D-36.)  Dr. Greenbaum stated that Garner "has been unable to work because of his [GI] symptoms for the last 3-4 weeks and will have some studies performed by me on October 31, 2011.  Therefore, I recommend that he be excused from work" until that date.  (Id.)  It is noted that Dr. Greenbaum's note did not conflict with Dr. Jones' decision to clear Garner to return to work on November 7, 2011- one week after the tests reference by Dr. Greenbaum.  (Id.);

5.  Garner did not return to work on November 7, 2011, and was placed in a "no pay" status as being absent without authorization.  (Id., Ex. P-43.)

---

[12]It is notable that Garner offered no evidence at this time concerning his GI problems and lymphoma.  It is also noted that Garner admitted at his deposition that no doctor ever advised him that he cannot work or should not work because of high blood pressure.  (Garner Dep. at 21-22.)  In addition, Garner acknowledged that he did not take blood pressure medication in September 2011, and that "uncontrolled hypertension" by itself did not prevent him from working at this time.  (Id. at 61-62.)

On November 16, 2011, Local 502 faxed to EHS a note, dated November 15, 2011, from PA Carly Smith ("PA Smith") of Hillmont GI stating that Garner should be excused from work from November 15, 2011 to December 5, 2011.  (Id., Ex. D-3.)  The note only stated that Garner was being treated for abdominal pain and diarrhea, and did not give a medical reason why Garner could not return to work.  (Id.)  EHS advised the union that this was insufficient to excuse Garner's absences.  (Id., Ex. D-39.)  On November 23, 2011, Garner was notified that a disciplinary hearing would be held on December 5, 2011.  (Id., Ex. P-49);

6.  At this hearing on December 5, 2011, Garner submitted additional evidence from Dr. Mallick dated December 1, 2011, which stated that he was "still having GI symptoms," but did not state that Garner was unable to work.  (Id., Ex. D-40.)  Garner also stated at the hearing that he was scheduled for a follow-up appointment with Hillmont GI.  (Id., Ex. P-60.)  As a result, the School District agreed to schedule another follow-up with EHS on December 12, 2011, in order to consider any additional evidence.  (Id.)  On December 12, 2011, Garner submitted a note from Hillmont GI's PA Smith dated December 9, 2011, that stated that Garner "may return to work."[13]  (Id., Ex. D-4.)  Accordingly, EHS instructed Garner to return to work on December 13, 2011.  (Id., Ex. D-6.)  In addition, the School District placed Garner on probation for one year for the unauthorized absences he had taken beginning on November 7, 2011.[14]  (Id., Ex. P-52);

7.  Garner returned to work the first week of January 2012, but immediately began to call out sick on a regular basis.  (Id., Ex. P-53.)  As a result, on January 19, 2012, he was issued a warning letter.  (Id.)  On this same day, Garner requested a medical leave because of continuous GI problems.  (Id.,Ex. D-8.)  As per policy, Garner was instructed to report to EHS on January 31, 2012, and to submit medical information to support his request.  (Id.)  On January 31, 2012, Garner submitted a note from PA Santiago of his primary care doctor's office (Dr. Pedano).  (Id., Ex. D-10.)  The note stated that Garner "may not return to work at this time," and "his return to work date has yet to be determined."  (Id., Ex. D-10.)  Despite, this note giving no details about the specifics of Garner's medical status nor a return-to-work date, the School District approved a medical leave

---

[13]It is noted that Garner acknowledged that he never again went to Hillmont GI after they told him he could return to work "[b]ecause I didn't see a doctor, and I requested one."  (Garner Dep. at 97.)

[14]Local 502 filed a grievance challenging this disciplinary action which remains pending. (McGrogan Dep. at 83-84.)

19

until February 13, 2012, when it scheduled him for a follow-up examination.  (Id., Ex. P-6);

8.  When Garner appeared for this appointment on February 13, 2012, he presented a note from Dr. Mallick dated February 3, 2012.  (Ex. D-41.) The note stated that Garner was being seen for "gastrointenstinal symptoms and abdominal lymphadenopathy," and he was being referred to a "gastroenterologist and a surgeon for further diagnostic work up."  (Id., Ex. D-41.)  Because the note said nothing about Garner's ability to work, EHS directed him to return to work on March 12, 2012.  (Id.)  Garner, however, was permitted to use four more weeks of his Paid Sick Days. (Id.)  Garner did not return to work on March 12, 2012, and his absences were determined to be unauthorized.  On this same date, McGrogan requested EHS to reconsider and provided a report from a cardiologist, Dr. Steve Vaganos.  (Id., Ex. D-11.)  Dr. Vaganos reported that Garner had a history of hypertension, but Garner was determined to correct this condition on his own and without medication.  (Id.)  Dr. Vaganos also noted that Garner had "recurrent abdominal pains and bloating," but said nothing about Garner's inability to work.  (Id.)  On March 22, 2012, McGrogan asked EHS to reconsider and submitted a note from PA Santiago dated March 21, 2012, which stated that Garner was "physically unable to work at this time due to chronic abdominal pain," and "[h]is return to work is yet to be identified."  (Id., Ex. D-13.)  Dr. Jones reviewed this evidence and concluded that there was "[n]o medical severity," and a disciplinary hearing was scheduled for April 12, 2012.  (Id., Ex. P-58);

9.  At this hearing, Garner relied on the same medical notes submitted to EHS in March, 2012, which EHS had rejected.  (Id., Ex. P-60.)  On May 18, 2012, before a disciplinary decision had been issued, McGrogan submitted a report to EHS from Dr. Mallick.  (Id., Ex. D-14.)  Dr. Mallick reported that Garner had "B-cell lymphoma most consistent with follicular lymphoma low grade."  (Id.)  Dr. Mallick recommended a colonoscopy, and stated that if the colonoscopy is positive for follicular lymphoma, Garner "would likely benefit significantly from chemotherapy.  However given the absence of objective signs and only presence of symptoms will rely on patients [sic] assessment of severity of symptoms to determine need for treatment."  (Id.)  Dr. Mallick's report said nothing about Garner's ability to work.  On June 6, 2012, the School District issued a decision recommending that Garner's employment be terminated.  (Id., Ex. P-60.)  In response, Local 502 filed a grievance, and continued to submit medical information on Garner's behalf.  (Id., Ex. D-15.)  A June 11, 2012 note from Dr. Mallick was submitted which stated that Garner was under

his care, and that he "has a long term illness which will require ongoing treatment, medical monitoring and follow up care at our offices.  At this time he is unable to work due to ongoing GI symptoms."  (Id.)  It is noted that this was the first time that Dr. Mallick mentioned anything about Garner's ability to work or not work.  (Id.)  Nor, did Dr. Mallick provide details about any medical treatment Garner was receiving or opine as to a time frame when he would be able to return to work.  (Id.)  McGrogan also submitted a note from Dr. Juliette Louis-Charles dated June 21, 2012, which stated that Garner was "evaluated for symptomology and disease process related to lymphoma.  His symptoms include bowel incontinence accompanied by constant abdominal pains and nausea.  He is unable to participate or assume normal work activities or responsibilities until her [sic] receives treatment for his conditions.  He remains disabled until further notice."  (Id., Ex. D-15);

10.  Before a grievance hearing was held, McGrogan came up with an idea that might resolve the termination and the grievance.  On July 3, 2012, he wrote to Garner and asked him if he would consider a health sabbatical which were given in six month intervals and in which he would be paid half of his salary.  (Id., Ex. D-16.)  Garner and the School District agreed to this proposal on July 17, 2012.  (McGrogan Dep. at 40-42.)  ESH approved the sabbatical for almost a year until June 30, 2013, and scheduled Garner for an appointment with them on June 3, 2013.  (Def.'s Mot. Summ. J., Ex. D-46.)  On this date, EHS cleared Garner to begin work the beginning of the school year starting on September 3, 2013.  (Id., Ex. D-47.)  Also on this same day, Garner wrote to EHS and requested that he be permitted to receive more treatment before he could return to work, and requested a third-party evaluation and "accommodations for my disabilities under the [ADA] and [PHRA] to use my sick leave and continuation of salary benefits to address my disability."[15]  (Id. Ex. D-48.)  With this letter, he submitted two doctor's notes.  One from Dr. Adam Cohen of Fox Chase Cancer Center dated January 16, 2013, which stated

---

[15]Garner asserts that it was only after the School District was made aware of his administrative complaint with the EEOC that it started making amends to mitigate its damages in September 2013, when the School District permitted him to use his personal illness benefits for the same medical condition that it had previously denied him before he filed his EEOC charge.  (Pl.'s Resp. at 3.)  This is clearly not the case.  As indicated above, the School District approved Garner's request for medical leave and to use his benefits several times beginning in May 2012, despite a lack of medical documentation supporting his contention that he was unable to work.

that "Mr. Garner has follicular lymphoma[16] and irritable bowel syndrome

---

[16]It must be noted at this time that Garner has not received any treatment for lymphoma, either in the past or at present, from any doctor.  Rather, such condition has been monitored by his oncologist(s).  Garner acknowledged this at his deposition, and testified:

Q.   Are you currently undergoing any treatments for your cancer?

A.  No Sir.

Q.  Have you ever undergone treatments for your cancer?

A.  When you say treatment, are you talking about medication?

Q.  Any form of treatment?

A.  I am seeing an oncologist.

Q.  And the oncologist is following up on the course of the cancer?

A.  Yes.

Q.  And has the oncologist recommended any therapies, procedures, medications to treat the cancer or the symptoms of the cancer?

A.  No, sir.

Q.  Ever?

A.  Treatment, yes; medication, no.

Q.  What treatments?

A.  They are just observing it and making sure it doesn't you know.

Q.  Just following the course of it?

A.  Right.

Q.  But nothing to actually address the symptoms.  Correct?

*       *       *

A.  No, sir.

(Garner Dep. at 16-17.)

and is being treated [there] for these diseases."  (Id.)  The second came from Dr. Stephen Heller, also from Fox Chase, dated May 23, 2013, which stated that "Mr. Garner is under my care for abdominal problems and is currently receiving medical treatment."  (Id.)  Neither note said anything about Garner's ability to work.  (Id.);

11.  Garner did not return to work on September 3, 2013.  During the summer, he suffered a subdural hematoma which required brain surgery. On September 4, 2013, Garner submitted a note from Dr. Tjoumakaris of Jefferson's Department of Neurological Surgery, which stated that Garner is "currently under my care for subdural evaluation of hematoma. [Garner] continues to improve with a [follow-up appointment] in 3 months when determination will be made regarding return to work."  (Id., Ex. D-49.) Although this condition was new and unrelated to GI problems, the EHS approved a medical leave of absence and permitted Garner to resume using his Paid Sick Days.  (Id., Ex. D-50.)  EHS scheduled Garner for an appointment on November 26, 2013.  (Id.)  On that date, Garner submitted another note from Dr. Tjoumakaris which stated that Garner continued to recover and could "return to work as of 1/6/14."  (Id., Ex. D-51.)  EHS approved Garner's request for medical leave and he continued to use his Paid Sick Days.  (Garner Dep. at 153);

12.  Garner, however, did not return to work on January 6, 2014.  He, subsequently, submitted a report from Dr. Tzeng of Jefferson's Stroke Center dated January 9, 2014, which described Garner's continuing headaches and cognitive difficulties since the hematoma.  (Id., Ex. D-52.) Dr. Tzeng opined that "I think that returning back to work on a part-time basis with limited responsibilities might actually help [Garner] in terms of regaining some of his cognitive acuity."  (Id.)  Dr. Tzeng also believed that "part of his issue may be related to depression, which he agrees with." (Id.)  Garner, however, did not return to work.  Garner did not believe that Dr. Tzeng's recommendation that he return to work was relevant because he believed he was unable to work due to ongoing GI issues.  (Garner Dep. at 157.)  Since that time, Garner has remained on approved medical leave. He has exhausted his entire bank of Paid Sick Days and his statutory Health Restoration Sabbatical.  He is currently in the middle of a one-year period of Wage Continuation benefits, which will expire in March 2015.[17]

---

[17]Thus, since May 2011, when Garner first began his medical leave, to the present, he has been on some form of approved leave, and collecting paid benefits, with the exception of four months during the 2011-2012 school year.  Garner remains a School District employee.  Moreover, we agree with the School District that because Garner never returned to work, he has lost nothing in terms of the finite paid

(Id. at 168-69.)

Here, we are of the opinion that the above-summarized history of the interaction between Garner and the School District speaks for itself. The School District clearly engaged in a good faith interactive process with Garner regarding his disability and accommodation for his disability. Thus, Garner's argument is without merit, and for all the reasons discussed above, we grant summary judgment in favor of the School District as to Garner's claim of discrimination under the ADA.

### B. Retaliation

Lastly, Garner asserts a claim of retaliation against the School District. To establish a prima facie case of retaliation under the ADA,[18] Garner must show that (1) he engaged in protected activity; (2) the School District took a "materially adverse" action against him; and (3) there was a causal connection between Garner's protected activity and the School District's action. See Moore v. City of Phila., 461 F.3d 331, 341-42 (3d Cir. 2006); see also Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173, 177 (3d Cir. 1997). Garner claims that: (1) he engaged in protected activity under the ADA and PHRA when he requested accommodation from the School

---

sick leave and other benefits available to School District employees. When Garner's Wage Continuation benefits expire in March, 2015, he will have received every possible dollar of paid leave benefits available to him as a School District employee.

[18]The Title VII framework for the analysis of retaliation claims is also applicable to ADA claims. See Williams v. Philadelphia Housing Authority, 230 F. Supp. 2d 631, 637 (E.D. Pa. 2002), aff'd in part and rev'd in part on other grounds, 380 F.3d 751 93 (3d Cir. 2004). Similarly, the now familiar burden shifting paradigm of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), applies to retaliation claims under the ADA in cases based on indirect evidence of discrimination. See Shaner v. Synthes, 204 F.3d 494, 500 (3d Cir. 2000).

District for his disability, and (2) he was subjected to an adverse employment action when his request was denied.  (Pl.'s Resp. at 27.)

The School District asserts that Garner's retaliation claim is "nothing more than a repackaged statement of his underlying claims that the School District failed to reasonably accommodate his disability," and, as such, fails as a matter of law.  (Def.'s Reply at 11.)  We agree.  In Williams, the District Court granted summary judgment to the employer where plaintiff predicated an ADA retaliation claim on the employer's denial of a request for accommodation. In granting summary judgment on the plaintiff's retaliation claim, the Court stated that the "[p]laintiff's claim, to the extent it is based upon the defendant's denial of his request for a reasonable accommodation, is stated as a retaliation claim in form, is, in substance, a claim of failure to accommodate."  Williams, 230 F. Supp. 2d at 639 n.10.  This is the case here.  Garner's retaliation claim is based entirely upon his failure to accommodate claim, and it cannot be presented as a separate claim.  See id.

Moreover, as discussed above, there is no evidence of record which would allow a reasonable jury to conclude that the School District retaliated against Garner when it denied his requests for indefinite periods of leave in November 2011 and March 2012.  The record clearly reflects that the School District had approved Garner for several lengthy leaves before it cleared him to return to work.  In addition, as noted, several of these leaves were granted even when Garner failed to produce medical evidence that he was unable to return to work.  For these reasons, we grant summary judgment in favor of the School District on Garner's retaliation claim.

25

## IV.  CONCLUSION

We find that Garner has not made out a prima facie case of discrimination under the ADA because he is not "otherwise qualified to perform the essential functions of [his] job, with or without reasonable accommodations" by the School District.  See Gaul, 134 F.3d at 579-80.  We further find that Garner's request to the School District for indefinite leave in order to use his Paid Sick Days and other benefits was not a reasonable accommodation under the ADA.  See Conoshenti, 364 F.3d at 151.  We also hold that the School District more than adequately engaged in the ADA mandated good faith interactive process with Garner concerning his disability.  See Taylor, 184 F.3d at 311.  Thus, we are of the opinion that a reasonable jury, viewing the evidence in a light most favorable to Garner, could not find that the School District violated his rights under the ADA.  Accordingly, we grant summary judgment in favor of the School District as to the claim of discrimination under the ADA.

Furthermore, we find that the evidence of record does not support a claim of retaliation against the School District.  Moreover, this claim is based entirely upon Garner's failure to accommodate claim and cannot be presented as a separate claim.  See Williams, 230 F. Supp. 2d at 639 n.10.  Therefore, we grant summary judgment in favor of the School District as to the retaliation claim.  Accordingly, summary judgment is granted in favor of the School District as to all of Garner's causes of action.

An appropriate Order follows.